UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 23, 2018

LUIS CABRERA,

                              Petitioner,

              -v.-

THE PEOPLE OF THE STATE OF NEW
YORK,

                              Respondent.

16 Civ. 7938 (KPF)

OPINION AND ORDER ADOPTING
REPORT AND RECOMMENDATION

KATHERINE POLK FAILLA, District Judge:

        Petitioner Luis Cabrera, who is proceeding *pro se* and is currently

detained at the Buffalo Federal Detention Facility in Batavia, New York, filed a

petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 on October 6,

2016 (the "Petition"), against Respondent People of the State of New York.

Petitioner seeks review of his conviction in New York State Supreme Court, New

York County, of one count of burglary in the second degree.  Pursuant to a

referral from this Court, United States Magistrate Judge Katharine H. Parker

issued a 37-page Report and Recommendation dated October 13, 2017 (the

"Report"), recommending that the Petition be denied.  The Court has examined

both the Report and Petitioner's October 30, 2017 Objection to that Report (the

"Objection"), and finds that the Report should be adopted in full.  Accordingly,

the Petition is denied.

# BACKGROUND[1]

The facts and procedural history leading up to the Petition are detailed in the Report. (*See* Report 2-13). Nonetheless, a brief summary of the relevant facts is useful to this Court's analysis.

After a bench trial, the trial court found Petitioner guilty on March 12, 2014, on one count of burglary in the second degree. (Report 9). Petitioner was sentenced on May 1, 2014, to a prison term of three and a half years, to be followed by two and a half years of post-release supervision. (*Id.*).

The evidence at trial established the following: On June 3, 2012, Yokasta Ballista and her daughter, Genesis Sanchez, arrived at their apartment in the Robert F. Wagner Houses and encountered Petitioner, with whom they were familiar, and an unidentified man in the hallway outside their apartment handling a new air-conditioner unit that resembled the one Ms. Ballista had recently purchased. (Report 2-3). Upon checking their apartment, Ms. Sanchez discovered that the family's air conditioner and other property was missing. (*Id.* at 3). Ms. Ballista attempted to grab the air conditioner, and the unknown man left the scene. (*Id.*). Petitioner fled as well, before returning to profess his innocence. (*Id.*). Ms. Sanchez reported the robbery but initially declined to identify Petitioner; at trial, Ms. Sanchez and Ms. Ballista explained that they considered Petitioner a family friend and had not personally witnessed him commit the crime. (*Id.*).

---

[1] This Opinion draws its facts largely from the Report (Dkt. #24) and the Objection (Dkt #25).

Lieutenant Jennara Cobb of the New York City Police Department (the "NYPD") was assigned that day to the Video Interactive Patrol Enhanced Response ("VIPER") 12 Unit, a unit tasked with maintaining video surveillance of the Wagner Houses; she learned of the incident over police radio. (Report 4). After reviewing surveillance video and identifying individuals who matched the victims' descriptions of the suspects, Lt. Cobb saved specific portions of the video that depicted the suspects and the victims. (*Id.*). The excerpted videos showed Petitioner entering and leaving an apartment building several times and carrying bags that Ms. Ballista identified as her property. (*Id.*). Lt. Cobb compiled the excerpted portions into one video of approximately 16 minutes' duration and burned it onto a disc; the video was introduced as People's Exhibit 12 at trial. (*Id.*).

Detective Gregory Redford, also investigating the case, visited VIPER 12 the next day and viewed surveillance video to look for men who matched the victim's descriptions of the two perpetrators. (Report 4). After observing video of two men matching those descriptions riding the elevator to the victim's floor several times and of Petitioner leaving the building carrying property, Detective Redford asked VIPER 12 to segregate and copy any portions of the surveillance video that included the two men. (*Id.* at 4-5). Lt. Cobb produced another disc, later introduced at trial as People's Exhibit 1, which contained approximately 30 minutes of video, including the 16 minutes that had been included in People's Exhibit 12. (*Id.* at 5).

Det. Redford showed the video to Ms. Ballista and Ms. Sanchez, who identified one of the two men as Petitioner. (Report 6). Det. Redford then reported internally to the NYPD that Petitioner was wanted in connection with the burglary, and Petitioner was arrested on March 18, 2013. (*Id.*).

Petitioner was indicted on eight counts of burglary in the second degree on March 25, 2013. (Report 6). The trial court dismissed seven counts for lack of evidence, and a bench trial on the remaining count began on March 6, 2014. (*Id.*).

Before opening statements, Petitioner's trial counsel objected to the introduction of People's Exhibit 1, arguing that the entirety of the video footage shot of the day of the incident should have been turned over, rather than merely the portions depicting the event in question. (Report 6). Prosecutors called Det. Redford to authenticate the video, but after objection and cross-examination by Petitioner's trial counsel, the trial court admitted only those portions of the video that Det. Redford could confirm he had personally watched. (*Id.* at 7).

At the close of its case, the prosecution called Lt. Cobb, explaining that the State now believed only Lt. Cobb could properly authenticate the video. (Report 7). Prosecutors then disclosed that they had only recently learned that (i) Lt. Cobb was the officer responsible for compiling the videos and (ii) Lt. Cobb was both under indictment in an unrelated matter and the subject of an adverse credibility finding in *United States* v. *Jackson*, No. 10 Cr. 783 (NRB), 2011 WL 1431983 (S.D.N.Y. Apr. 12, 2011). (*Id.* at 7-8). The State argued that

these disclosures satisfied the obligations imposed by *Brady* v. *Maryland*, 373 U.S. 83 (1963). (*Id*. at 8). Petitioner's counsel objected to Lt. Cobb's testimony and argued that it would be prejudicial, as counsel would have conducted additional research if notified of Lt. Cobb's background earlier. (*Id*.). The trial court ruled that Lt. Cobb could testify, but that Petitioner's counsel would be able to seek additional time to prepare for cross-examination. (*Id*.).

Before Lt. Cobb's testimony, prosecutors explained that they intended to have her introduce People's Exhibit 12 in addition to the remainder of People's Exhibit 1; Petitioner's counsel renewed her objections. (Report 8). Lt. Cobb then testified as to the creation of the videos. (*Id*.). Before cross-examination, the trial court asked Petitioner's trial counsel if she was ready to begin, and she responded that she was. (*Id*.). On cross-examination, Lt. Cobb explained that her then-current assignment was the result of modified duty after her indictment, and she invoked her Fifth Amendment rights in response to further questions about the indictment. (*Id*. at 9). She also testified that between the time she had spoken with Det. Redford regarding the creation of People's Exhibit 1 and trial, she had had no involvement in the case. (*Id*.). After her testimony and further argument, the trial court admitted People's Exhibits 1 and 12. (*Id*.). On March 12, 2014, the trial court found Petitioner guilty, and on May 1, 2014, it sentenced Petitioner. (*Id*.).

In his direct appeal to the Appellate Division, Petitioner argued that he had been denied a fair trial due to the admission of People's Exhibits 1 and 12; that the evidence at trial had been legally insufficient to establish the element

of unlawful entry; and that the untimely disclosure of impeachment evidence had violated the State's constitutional obligations under *Brady*. (Report 9-10). The First Department affirmed Petitioner's conviction on March 31, 2016. *See People* v. *Cabrera*, 137 A.D.3d 707 (1st Dep't 2016). Petitioner's application for leave to appeal that decision was then denied by the New York Court of Appeals on June 9, 2016. *People* v. *Cabrera*, 27 N.Y.3d 1129 (2016).

Petitioner is a citizen of the Dominican Republic, and on May 14, 2015, the Department of Homeland Security ("DHS") served Petitioner with a Notice to Appear for removal proceedings. (Report 11). DHS argued that Petitioner was subject to removal due to a prior conviction for the crime of attempted criminal possession of cocaine. (*Id.*). On May 18, 2016, DHS added a charge against Petitioner under Section 237 of the Immigration and Nationality Act for the burglary conviction at issue here. On August 30, 2016, an Immigration Judge ordered Petitioner's removal, and he remains in federal detention awaiting a determination of his appeal from that order.

On October 6, 2016, Petitioner filed his Petition with this Court, asserting the same three claims for relief that the First Department had rejected. (Report 12). Before receiving a response, Petitioner filed a second submission restating his previous claims and adding two claims of ineffective assistance of counsel. (*Id.*). Specifically, Petitioner argued that his counsel had failed (i) to investigate his mental state and raise a possible insanity defense, and (ii) to inform him of the immigration consequences of a non-jury trial and, relatedly, failed to seek a judicial recommendation against

6

deportation ("JRAD"). (*Id.*). Petitioner argued that he might not have agreed to a bench trial, had he understood the immigration consequences that could result from a conviction. (*Id.*). By Order dated April 12, 2017, this Court ordered that this second submission would serve as the operative Petition. (*Id.* at 13).

On November 9, 2016, this Court referred the case to Magistrate Judge Katharine H. Parker. (Report 12). Judge Parker issued the Report on October 13, 2017, recommending that the Petition be denied in its entirety. As to Petitioner's first claim that he had been denied a fair trial due to the admission of People's Exhibits 1 and 12, Judge Parker ruled that the trial court was well within its discretion to admit the videos, which were introduced by competent police witnesses and highly probative as to Petitioner's guilt. (*Id.* at 18-21). Next, Judge Parker ruled that Petitioner's argument that his conviction was against the weight of evidence was both unexhausted and procedurally barred. (*Id.* at 18-21). Judge Parker then considered, and rejected, Petitioner's claim that the late disclosure of information related to Lt. Cobb's indictment precluded him from presenting an adequate defense. She ruled that the Appellate Division did not err in determining that the trial court had adequately cured any *Brady* issues by providing defense counsel additional time to investigate Lt. Cobb. (*Id.* at 26-29).

Finally, Judge Parker examined Petitioner's ineffective assistance of counsel claims, determining first that Petitioner had not exhausted them, inasmuch as he raised them for the first time only in the Petition. (Report 29-

7

30). Nevertheless, Judge Parker considered the merits of the claims pursuant to 28 U.S.C. § 2254(b)(2). (*Id.* at 29-30). Judge Parker determined that counsel's failure to raise an insanity defense was not ineffective as there was no evidence to suggest that such a defense was viable. (*Id.* at 33-34). She then determined that the claims regarding waiver of a jury trial and the failure to ask for a JRAD lacked merit, as Petitioner failed to demonstrate that a jury trial would have resulted in a different outcome and "the JRAD procedure is no longer part of our law." (*Id.* at 34-36 (citing *Padilla* v. *Kentucky*, 559 U.S. 356, 363 (2010))).

On October 30, 2017, Petitioner filed the Objection, which stated in relevant part that he "object[ed] to the report and recommendation in its entirety, and respectfully request[ed] that the Court grant the relief sought in his petition for [a] writ of habeas corpus[.]" (Objection 4).

## DISCUSSION

A court may accept, reject, or modify, in whole or in part, the findings or recommendations made by a magistrate judge. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Grassia* v. *Scully*, 892 F.2d 16, 19 (2d Cir. 1989). A court may also accept those portions of a report to which no specific, written objection is made, as long as the factual and legal bases supporting the findings are not clearly erroneous. *See Ramirez* v. *United States*, 898 F. Supp. 2d 659, 663 (S.D.N.Y. 2012) (citation omitted). A magistrate judge's decision is clearly erroneous only if the district court is "'left with the definite and firm conviction

that a mistake has been committed.'" *Easley* v. *Cromartie*, 532 U.S. 234, 242 (2001) (quoting *United States* v. *U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

When a timely and specific objection has been made, the district court is obligated to review the issues *de novo*. *See* Fed. R. Civ. P. 72(b)(3); *Hynes* v. *Squillace*, 143 F.3d 653, 656 (2d Cir. 1998). However, when the objections make solely conclusory statements, the court reviews the report and recommendation for clear error. *Dickerson* v. *Conway*, No. 08 Civ. 8024 (PAE) (FM), 2013 WL 3199094, at *1 (S.D.N.Y. June 25, 2013); *see Kirk* v. *Burge*, 646 F. Supp. 2d 534, 538 (S.D.N.Y. 2009) (collecting cases). Although *pro se* filings are read liberally and interpreted "to raise the strongest arguments that they suggest" *Pabon* v. *Wright*, 459 F.3d 241, 248 (2d Cir. 2006) (internal quotation marks omitted), "even a *pro se* party's objections . . . must be specific and clearly aimed at particular findings in the magistrate's proposal[,]" *DiPilato* v. *7-Eleven, Inc.*, 662 F. Supp. 2d 333, 340 (S.D.N.Y. 2009) (citation omitted).

Petitioner raises no specific objection to the Report's conclusions. (*See* Objection 1-4). Beyond a conclusory sentence noting his objection, Petitioner's submission merely restates the case's procedural history and the arguments raised by the parties. (*Id.*). Even reading Petitioner's Objection liberally, the Court does not find there are specific objections that trigger *de novo* review.

## CONCLUSION

The Court has thus reviewed the Report for clear error, and finds none. The Court agrees completely with Judge Parker's thoughtful and well-reasoned Report and hereby adopts its reasoning by reference.

For the foregoing reasons, the Report is adopted in full, and the Petition is DENIED. The Clerk of Court shall dismiss this Petition and close the case.

Since Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). Pursuant to 28 U.S.C. § 1915(a)(3), any appeal from this Order would not be taken in good faith; therefore *in forma pauperis* status is denied for the purpose of any appeal. *Coppedge* v. *United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

Dated: October 23, 2018
      New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge


*Copies of this Opinion and the Report were sent by first class mail to:*
Luis Cabrera
A#205-708-837
Buffalo Federal Detention Facility
4250 Federal Drive
Batavia, NY 14020

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 10/13/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LUIS CABRERA,

                Petitioner,

    – against –

THE PEOPLE OF THE STATE OF NEW YORK,

                Respondent.

**REPORT AND RECOMMENDATION**

16-cv-07938 (KPF) (KHP)

**TO:  THE HONORABLE KATHERINE POLK FAILLA, United States District Judge**

**FROM:  KATHARINE H. PARKER, United States Magistrate Judge**

       Petitioner Luis Cabrera, proceeding pro se, filed a petition for a writ of habeas corpus

(the "Petition") pursuant to 28 U.S.C. § 2254, challenging his conviction after a bench trial in

New York Supreme Court, New York County, of burglary in the second degree and his sentence

to a prison term of three and a half years, to be followed by two and a half years of post-release

supervision.

       Petitioner asserts four grounds for habeas relief: (1) the trial court erred in admitting

two videos into evidence, thus depriving him of a fair trial; (2) his conviction was against the

weight of the evidence; (3) the state courts erred in ruling that the People of the State of New

York (the "State") lived up to its obligation under *Brady v. Maryland,* 373 U.S. 83 (1963), to turn

over material which could be used to impeach one of the State's witnesses, thus depriving him

of his rights under the Sixth and Fourteenth Amendments; and (4) his trial counsel was

ineffective for failing to ask him if he was suffering from mental illness as a predicate to raising

an insanity defense, for failing to inform him that, if convicted, he would be subject to deportation, and for failing to ask for a judicial recommendation against deportation ("JRAD").

Respondent opposes the Petition. Respondent first argues that Petitioner's claim regarding the admissibility of the video evidence is not cognizable upon habeas review because the claim is based on state law, and that, in any event, the trial court's admission of the evidence did not deprive Petitioner of a fair trial. Respondent next contends that Petitioner's second claim, that his conviction was against the "weight of the evidence," is unexhausted and furthermore, is similarly not cognizable. As to Petitioner's third ground for habeas relief, Respondent asserts that the Appellate Division reasonably applied Supreme Court precedent in rejecting Petitioner's *Brady* claim. Finally, Respondent contends that Petitioner's claim for ineffective assistance of counsel is unexhausted and not procedurally defaulted, but that it should nevertheless be dismissed because it fails on the merits.

For the reasons that follow, this Court concludes that Petitioner's first and third claims, though exhausted, were reasonably denied by the New York Appellate Division, First Department ("Appellate Division") applying clearly established federal law; his second claim is unexhausted and procedurally barred; and his fourth claim is unexhausted, but clearly without merit. This Court therefore recommends that the Petition be dismissed in its entirety.

## BACKGROUND

### A. *Trial Evidence*

On June 3, 2012, after arriving home from church, Yokasta Ballista and her 18-year-old daughter, Genesis Sanchez, encountered Petitioner, a Hispanic male, and an unknown African-American man in the hallway outside their apartment in the Robert F. Wagner Houses. Ms.

Ballista and Ms. Sanchez observed Petitioner, whom they had known for over a decade as a family friend, and the unknown man standing over a box that appeared to contain their family's new air conditioner unit, which they had recently purchased but not yet installed. Ms. Ballista commented to Ms. Sanchez that the air conditioner looked like theirs, and asked Ms. Sanchez to check the apartment to see if their air conditioner was missing. Upon entering the unlocked apartment, Ms. Sanchez discovered that the family's air conditioner and other property, including a new stereo system, were missing.

Ms. Ballista then tried to grab the air conditioner from the men. The unknown man initially claimed that the air conditioner belonged to him, but fled shortly thereafter.[1] Petitioner initially left the scene as well, but soon returned and helped the women carry the air conditioner back into their apartment. According to Ms. Sanchez and Ms. Ballista, throughout the encounter, Petitioner was "shaking a lot," seemed "nervous," and avoided eye-contact with them. (Doc. No. 20-3 p. 102.) Petitioner also allegedly told Ms. Sanchez and Ms. Ballista that he did not do anything wrong, saying that he was their friend and would never do something like this.

Ms. Sanchez subsequently reported the incident to the police, but, at Ms. Ballista's direction, did not immediately identify Petitioner as one of the perpetrators. According to the trial testimony, Ms. Ballista and Ms. Sanchez did not provide Petitioner's name to the responding officers because, while they suspected Petitioner was involved, they had not witnessed the crime, and Petitioner was a family friend.

---

[1] This individual was never identified or apprehended.

Lieutenant Jennara Cobb, the commanding officer of NYPD's Video Interactive Patrol Enhanced Response ("VIPER") 12 Unit, a unit tasked with monitoring and maintaining video surveillance of the Wagner Houses, heard about the incident over the police radio on the day it was reported. Lt. Cobb reached out to the responding officers to get a description of the suspects. She then reviewed surveillance footage of the Wagner Houses and found portions of recorded video that depicted two men who matched the description of the suspects involved in the incident, as given by the responding officers. Specifically, Lt. Cobb "clipped" and saved portions of the surveillance recordings from different cameras that depicted only the suspects and the victims (Ms. Ballista and Ms. Sanchez). Lt. Cobb chose not to include in the compilation any footage that did not depict Petitioner, the unknown man, or the victims. The "clipped" footage selected by Lt. Cobb depicted Petitioner entering and leaving the building several times. The footage also showed Petitioner carrying items out of the building in bags that Ms. Ballista subsequently recognized as hers. After spending about five hours watching 20 hours of recorded, sped-up surveillance footage, Lt. Cobb compiled the saved portions of the footage into one video and burned it onto a disc, which was later designated People's 12. The video did not have timestamps or any other markers indicating the time or date of the events it depicted, as they were erased during the process of compiling the video.

Detective Gregory Redford, also of the NYPD, began investigating the burglary on the following day. As part of his investigation, Detective Redford visited VIPER 12 and viewed the footage recorded by VIPER 12's surveillance cameras on the morning and afternoon of the incident, looking for men whose appearances matched those given by the witnesses. With assistance from Lt. Cobb, Detective Redford found video footage of two men, one Hispanic

(Petitioner) and one African-American, entering the building several times empty-handed and riding the elevator to the floor on which the victims live, and of Petitioner leaving the building carrying property. Detective Redford testified that he watched several hours of the surveillance recordings, but he did not find any footage of Petitioner actually entering the victim's apartment, nor of the encounter with the victims in the hallway.

Detective Redford then asked for someone at VIPER 12 (later identified as Lt. Cobb) to burn the footage of the two burglary suspects onto a disc. This video would later be designated People's 1. Like People's 12, People's 1 contained spliced and compiled footage from different cameras depicting the two men in the lobby and stairwell of the building, plus additional footage of the two men outside of the building, as captured by VIPER 12's cameras.[2] Detective Redford did not personally view this exterior footage, but asked VIPER 12 personnel to include in the video any additional footage of the suspects. The People's 1 video did not contain any footage of the building from the rest of the day, or of any other people besides the two suspects and the victims. And, like People's 12, People's 1 did not bear any timestamps or other indicia of the time or date of the footage depicted on the disc. People's 1 contained approximately 30 minutes of video, which was longer than the 16 minutes of video contained on People's 12. Notably, all of the footage selected by Lt. Cobb and compiled in People's 12 was included in People's 1. Detective Redford received the People's 1 disc either later on the same

---

[2] Both videos (People's 1 and 12) were made up of footage from several cameras that was compiled together. Both Detective Redford and Lt. Cobb testified that the footage depicted the same events from different angles in sequential order (*i.e.,* Camera 1 showing Petitioner enter building followed by Camera 2 showing same, Camera 1 showing him go upstairs followed by Camera 2 showing same, etc.).

day that he visited VIPER 12, or on the following day. Detective Redford provided a copy of the

People's 1 disc to the State after Petitioner was arrested.

Two days after People's 1 was created, Detective Redford showed it to Ms. Ballista and

Ms. Sanchez. Ms. Ballista and Ms. Sanchez identified the Hispanic man depicted on the video as

Petitioner. Detective Redford subsequently alerted other police officers that Petitioner was

wanted in connection with the burglary. On March 18, 2013, Petitioner was arrested.

B. *Petitioner's Trial And Appeals*

On March 25, 2013, Petitioner was indicted on eight counts of burglary in the second

degree. The trial court subsequently dismissed seven of the eight counts for insufficient

evidence. On March 6, 2014, a bench trial commenced in New York County Supreme Court on

the remaining single count of second-degree burglary.

At trial, arguments about the admissibility into evidence of People's 1 began before

opening arguments. Petitioner's trial counsel objected to the introduction of the video into

evidence, arguing that that the entirety of the video footage captured on the day of the

incident should have been turned over to the defense, not just the portions that purported to

depict the events in controversy, and that the video compilation was misleading and unduly

prejudicial.

The State called its first witness, Detective Redford, in an attempt to lay a foundation

upon which to enter the video into evidence. Detective Redford testified in detail as to his

investigation, including visiting VIPER 12 and selecting the footage that was compiled onto

People's 1, but he was not able to fully testify about the technical capabilities of VIPER 12's

surveillance or VIPER's operating procedures. Following the State's direct examination of

Detective Redford, the State moved to admit the video compilation into evidence as People's 1.

On cross-examination, Petitioner's trial counsel questioned Detective Redford about

whether the video had a proper foundation upon which it could be admitted into evidence. As

he had stated during direct examination, Detective Redford testified that he did not burn the

disc himself, nor did he know the identity of the person who did. He also admitted that he did

not know how the footage captured by VIPER 12's surveillance cameras was stored, or exactly

how long it was stored. Detective Redford also testified that he did not remember exactly how

much VIPER surveillance footage he watched, but he recalled that he did not view surveillance

footage captured by the exterior cameras from the day of the burglary. The trial court allowed

the State to enter People's 1 into evidence, but only the parts that Detective Redford could

confirm he watched in the VIPER facility, and subject to further argument by defense counsel.

At the close of the State's case, on Friday, March 7, 2014, the State announced that it

would call Lt. Cobb as a witness to authenticate the full version of People's 1. Lt. Cobb was not

identified on the State's witness list before trial. The State explained that it had attempted to

lay a foundation upon which to enter People's 1 through Detective Redford, but that it now

believed that Detective Redford's testimony was insufficient to do so under New York law. The

State explained that it had only learned the day before that Lt. Cobb was the one who created

People's 1.

The State disclosed that Lt. Cobb was indicted in an unrelated case and provided

Petitioner's trial counsel with a copy of the indictment from that case, as well as a Voluntary

Disclosure Form and a copy of a decision in *United States v. Jackson*, No. 10-cr-783 (NRB), 2011

WL 1431983 (S.D.N.Y. Apr. 12, 2011), a case in which Lt. Cobb had testified.[3] The State asserted

that these disclosures satisfied its obligations under *Brady*.

Petitioner's trial counsel objected strenuously to the State's identification of Lt. Cobb as

a trial witness. Petitioner's trial counsel argued that she was "completely prejudiced" by the

State's belated identification of Lt. Cobb and that, if Lt. Cobb had been properly identified as a

witness, she would have conducted additional research into Lt. Cobb's personnel records and

testimony in *United States v. Jackson*. (Doc. No. 20-4 pp. 48-50.)

The trial court ruled that the State would be allowed to call Lt. Cobb as a witness on the

following Monday, but that, following the State's direct examination, Petitioner's trial counsel

would be permitted to tell the court how much time she needed to prepare for cross-examining

Lt. Cobb.

On Monday, March 10, 2014, the parties renewed their argument over the State's intent

to call Lt. Cobb as a witness. The State stated that it would seek to introduce into evidence the

shorter surveillance compilation prepared by Lt. Cobb, People's 12, in addition to People's 1.

Petitioner's trial counsel objected to this, arguing that the State should have turned over

People's 12, along with the *Brady* materials, long before trial in order to afford Petitioner a

reasonable opportunity to use the material in developing his trial strategy. The court ruled that

the State would be allowed to argue for the introduction of People's 12.

---

[3] In *United States v. Jackson*, the court declined to credit Lt. Cobb's testimony on the grounds that it was inconsistent with the testimony of three other officers. 2011 WL 1431983, at *11.

The State then called Lt. Cobb to the stand. Lt. Cobb testified about the operating procedures and technical capacities of VIPER 12. Lt. Cobb also testified about her involvement in viewing the surveillance footage and creating People's 1 and People's 12.

Following the State's direct examination of Lt. Cobb and a recess, the trial court asked Petitioner's trial counsel if she wished to begin cross examination. Petitioner's counsel responded that she was ready to begin questioning Lt. Cobb.

On cross-examination, Petitioner's trial counsel elicited from Lt. Cobb that she had been assigned to VIPER as part of a modified duty assignment following her indictment. Petitioner's trial counsel attempted to ask Lt. Cobb about the indictment, but, following her attorney's advice, Lt. Cobb invoked her Fifth Amendment rights. Lt. Cobb testified that in the time between her interaction with Detective Redford at VIPER 12 and the middle of trial, she had had no further involvement with this case.

Following Lt. Cobb's testimony and further argument by the State and Petitioner's trial counsel, the trial court admitted both People's 1 and People's 12 into evidence.

On March 12, 2014, the trial court found Petitioner guilty of second-degree burglary. On May 1, 2014, the court sentenced him to three and a half years in prison, followed by two and a half years of supervised release.

### C. *Petitioner's Appeals To The Appellate Division And The New York Court Of Appeals*

Petitioner, through counsel, appealed his conviction to the Appellate Division on three grounds: (1) he was denied a fair trial as a result of the trial court erroneously admitting People's 1 and People's 12, the surveillance videos, into evidence; (2) the weight of the evidence did not support the element of unlawful entry, which is needed for a burglary

conviction; and (3) the State's untimely disclosure of impeachment evidence violated its

obligations under *Brady* and deprived him of the opportunity to use the materials in planning

his defense. In his Appellate Division brief, Petitioner cited to the federal Constitution in

support of his argument that the evidentiary ruling deprived him of a fair trial, but did not cite

to any federal law in connection with his "weight of the evidence" argument. Petitioner made

his third argument, the *Brady* claim, in federal terms.

On March 31, 2016, the Appellate Division unanimously affirmed Petitioner's conviction

and sentence. *People v. Cabrera*, 137 A.D.3d 707 (1st Dep't 2016), *lv. denied*, 27 N.Y.3d 1129

(2016). The Appellate Division first held that the State had laid a sufficient foundation upon

which to admit the video footage into evidence. The Appellate Division found that the video

was authenticated by a "competent police witness," Lt. Cobb, "who testified in detail about the

videotaping and compilation process." *Id.* at 707. Accordingly, the court found that there was

"no reason to believe that the compilation was incomplete or otherwise unsatisfactory," and

further concluded that there was "no basis for disturbing the [trial] court's credibility

determinations." *Id.* at 708. The Appellate Division next held that Petitioner's conviction was

not against the weight of the evidence. *Id.* Finally, the Appellate Division held that Petitioner

had not demonstrated that he was prejudiced by the State's mid-trial *Brady* disclosure. *Id.* The

Appellate Division reasoned that the State had not originally intended to call Lt. Cobb, but that

it "disclosed the impeachment material immediately after learning that this witness's testimony

was necessary to authenticate the videotape." *Id*. The court further found that the trial court

provided a "suitable remedy" for any delayed disclosure by offering Petitioner an adjournment

to prepare for the cross-examination of Lt. Cobb, a "remedy that could have readily been implemented in a nonjury trial, but that offer was declined." *Id.*

On April 6, 2016, Petitioner filed an application for leave to appeal to the New York Court of Appeals. In his counseled letter to the Court of Appeals, Petitioner sought review of the following three issues:

- "Whether the trial court improperly admitted a surveillance video recording that had been spliced, truncated, and stripped of its time stamps and whether the editor of the video was credible."

- "Whether the weight of the evidence supported the element of unlawful entry; and"

- "Whether the delayed disclosure of *Brady* material violated [Petitioner's] rights."

(Doc. No. 20-2 p. 44.) Petitioner also attached copies of the parties' Appellate Division submissions, as well as a copy of the Appellate Division's decision, to his application and asked the Court of Appeals to "consider and review all issues in the attached briefs." (Doc. No. 20-2 p. 44.) On June 9, 2016, the Court of Appeals denied Petitioner's request for leave to appeal. *Cabrera,* 27 N.Y.3d 1129.

### D. *Petitioner's Deportation Proceedings*

Petitioner is a native and citizen of the Dominican Republic. On May 14, 2015, the U.S. Department of Homeland Security ("DHS") served Petitioner with Notice to Appear for removal proceedings under Section 240 of the Immigration and Nationality Act ("INA"). In the Notice to Appear, which appears to have superseded a previous Notice issued on April 18, 2013, DHS charged that Petitioner was subject to removal under Section 212 of the INA because Petitioner had been convicted of the crime of attempted criminal possession of cocaine on January 8, 1998 in the Supreme Court of New York, New York County. On May 18, 2016, DHS lodged an

additional charge against Petitioner under Section 237 of the INA for the burglary conviction at issue in this Petition. On August 30, 2016, an Immigration Judge ordered that Petitioner be removed from the United States to the Dominican Republic. Petitioner is currently in federal custody awaiting a determination of his appeal from the order of deportation.

**E.** ***Petitioner's Petition For Writ Of Habeas Corpus And Petition For Writ Of Error* Coram Nobis**

On October 6, 2016, Petitioner filed his Petition for writ of habeas corpus with this Court, asserting the following three grounds for relief: (1) the trial court erred in admitting the two videos into evidence, thus depriving him of a fair trial; (2) his conviction was against the weight of the evidence; (3) the state courts erred in ruling that the State fulfilled its *Brady* obligation to turn over impeachment material related to Lt. Cobb, thus depriving him of his due process rights.

Before Respondent filed its response, Petitioner submitted a second petition to this Court, titled as a petition for a writ of error *coram nobis*. (Doc. No. 15.) In this second submission, Petitioner restates the three aforementioned arguments, but also adds a new claim of ineffective assistance of counsel. Relying on both New York and federal law, Petitioner argues that his trial counsel's performance was constitutionally deficient because she failed to investigate his mental state and raise an insanity defense, as well as failed to inform him of the consequences of a non-jury trial – specifically, that he could be deported if convicted. Petitioner asserts that had he known this, he may not have accepted counsel's suggestion to waive a jury and proceed to a bench trial. Petitioner also faults his trial counsel for failing to ask the trial court for a judicial recommendation against deportation.

On April, 12, 2017, the Honorable Judge Katherine Polk Failla ordered that Petitioner's second submission would be construed as an attempt to amend the initial Petition. (Doc. No. 14.) The Clerk of Court subsequently docketed Petitioner's submission as an amended Petition for writ of habeas corpus. Respondent thereafter filed its Response to the Amended Petition.

## DISCUSSION

### I. LEGAL STANDARD

#### A. *Standard For Habeas Review*

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 562 U.S. 86, 97 (2011). A state prisoner can obtain federal habeas relief only by showing that the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or resulted in a decision that was based on an unreasonable determination of the facts presented to the state court. 28 U.S.C. § 2254(d)(1)-(2).

"To be 'contrary to' clearly established law, a state court must reach a conclusion of law antithetical to a conclusion of law by the Supreme Court, or decide a case differently than the Supreme Court has when the two cases have 'materially indistinguishable facts.'" *Rosario v. Ercole*, 601 F.3d 118, 123 (2d Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring)). In the AEDPA context, "clearly established" law refers to "only the holdings, as opposed to the dicta, of th[e] [Supreme] Court's decisions." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (citation omitted). It is not enough that the facts of a case are "similar

to" those at issue in the relevant Supreme Court case—the two cases must involve the same specific question. *Id.* at 1377.

Once the clearly established Supreme Court holding has been distilled, "an 'unreasonable application of' those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Id.* at 1376. To clear the high bar for habeas relief, a petitioner must establish that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

**B. *Exhaustion And Procedural Default***

Prior to seeking federal habeas review, a petitioner in state custody is required to exhaust all remedies available in state court. 28 U.S.C. § 2254(b)(1); s*ee also Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014). This means that a petitioner "must give the state courts *one full opportunity* to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1991) (emphasis added). A "complete round," *id.*, requires the petitioner to present the "essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson,* 763 F.3d at 133 (citation omitted)*; see also Carvajal v. Artus*, 633 F.3d 95, 104 (2d Cir. 2011) ("[t]he exhaustion requirement is animated by notions of comity between the federal and state justice systems") (internal quotations and citation omitted).

In New York, a state prisoner invokes "one complete round" of appellate review by appealing first to the Appellate Division, and then seeking leave to appeal to the State Court of

Appeals. *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). The Court of Appeals' procedural rules require that a criminal leave application identify "the grounds upon which leave to appeal is sought," as well as annex copies of the submissions and relevant decision from the Appellate Division. 22 N.Y.C.R.R. § 500.20(a)-(b).[4]

When a habeas petition presents unexhausted claims, the federal court must determine whether the petitioner would be able to return to state court to exhaust the claims. *Jackson*, 763 F.3d at 133. If the petitioner's claim is unexhausted and the petitioner cannot obtain further review of those claims in state court for procedural reasons, then the federal court must deem the claim procedurally defaulted. *Carvajal*, 633 F.3d at 104 (quoting *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001)); *see also Jackson*, 763 F.3d at 133 ("if the state prisoner fails to exhaust his state remedies in a manner in which, were he to return to the state courts with his unexhausted claim, those courts would find the claim barred by the application of a state procedural rule, we must deem the claim procedurally defaulted") (internal quotations omitted). The only exceptions to this rule are if the petitioner establishes either "cause for the default and prejudice" or that he is "'actually innocent' of the crime for which he was convicted." *Carvajal*, 633 F.3d at 104.

---

[4] However, the Supreme Court has held that simply because a state's highest court has the opportunity to review such documents, it does not mean that it assumes the obligation to do so. *Baldwin v. Reese*, 541 U.S. 27, 31-32 (2004); *see also Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991) (New York Court of Appeals does not have "a duty to look for a needle in a paper haystack," and seek out claims that may have been raised in a lower court).

## II. ANALYSIS OF PETITIONER'S CLAIMS

### A. *Admission Of The Surveillance Videos*

Petitioner first argues that he is entitled to habeas relief because the trial court erred in admitting the surveillance compilations, People's 1 and 12, into evidence, and that this error deprived him of his constitutional right to a fair trial. Specifically, Petitioner contends that the surveillance videos should not have been admitted because they lacked a proper foundation and the testimony of the authenticating witness—Lt. Cobb—was not credible.

### 1. *Exhaustion*

This Court first finds, as a threshold matter, that Petitioner has adequately exhausted his challenge to the admissibility of the surveillance videos. Petitioner invoked a complete round of appellate review in state court by arguing this claim before the Appellate Division and the Court of Appeals. Before the Appellate Division, Petitioner cited to the Fourth and Fourteenth Amendments of the federal Constitution in connection with his argument that the admission of the video deprived him of his due process right to a fair trial. Although Petitioner's leave application to the Court of Appeals did not specifically reference the federal nature of this claim, Petitioner's letter clearly stated that he was seeking consideration and review of all of the issues raised in his appellate briefs, which would include his claim that his constitutional rights were violated by the evidentiary ruling. *See Morgan v. Bennett*, 204 F.3d 360, 370-71 (2d Cir. 2000) (petitioner fairly presented his claims to Court of Appeals where his leave application expressly sought review of all issues raised in his appellate briefs); *Fisher v. Superintendent*, No. 12-cv-6703 (JPO), 2014 WL 128015, at *6 (S.D.N.Y. Jan. 14, 2014) (adopting Report & Recommendation holding the same).

2. *Legal Standard Governing Challenges To Evidentiary Rulings In A Habeas Petition*

Challenges to a state court's evidentiary rulings, even if erroneous, concern matters of state law and, as such, are not cognizable on habeas review. *See* 28 U.S.C. § 2254(a); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). A federal court cannot grant habeas relief as a result of an allegedly incorrect evidentiary ruling "unless the alleged errors are so prejudicial as to constitute fundamental unfairness," in violation of the petitioner's constitutional right to due process. *Nunez v. Conway*, 923 F. Supp. 2d 557, 568 (S.D.N.Y. 2013); *see also Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012).

In assessing whether a state court's allegedly erroneous admission of evidence deprived a petitioner of his right to a fair trial, federal habeas courts consider "(1) whether the trial court's evidentiary ruling was erroneous under state law, and (2) whether the error amounted to the denial of the constitutional right to a fundamentally fair trial" under clearly established Supreme Court precedent. *Taylor v. Connelly*, 18 F. Supp. 3d 242, 257 (E.D.N.Y. 2014) (citing *Wade v. Mantello*, 333 F.3d 51, 59-60 & n. 7 (2d Cir. 2003)); *see also Evans v. Fischer*, 712 F.3d 125, 133 (2d Cir. 2013). Such claims are a "doubly difficult challenge" because "[t]he combination of the Supreme Court's 'fundamental fairness' cases and the limited habeas jurisdiction granted by AEDPA" means that Petitioner must (1) establish that the effect of the admission of the surveillance video was so prejudicial to his defense that he was deprived of due process *and* (2) identify a Supreme Court case that clearly establishes that the admission of the evidence constitutes a violation of the Fourteenth Amendment. *Evans*, 712 F.3d at 133.

3. *Application Of The Legal Standard To Petitioner's Claims*

Under this standard, this Court cannot conclude that the admission of the highly probative surveillance video evidence violated "those fundamental conceptions of justice which lie at the base of our civil and political institutions . . . and which define the community's sense of fair play and decency." *Dowling v. United States*, 493 U.S. 342, 353 (1990) (internal quotations and citations omitted).

With respect to the first prong of the analysis—whether the admission of the surveillance video was erroneous—under New York law, "[t]he decision to admit or exclude videotape evidence generally rests . . . within a trial court's founded discretion." *People v. Patterson*, 93 N.Y.2d 80, 84 (1999). Video evidence "may be authenticated by the testimony of a witness to the recorded events or of an operator or installer or maintainer of the equipment that the videotape accurately represents the subject matter depicted." *Id.*

In this case, the Appellate Division held that the State had established a sufficient foundation for the admission of the surveillance compilations at issue in this Petition, reasoning that:

> Authentication was provided by a competent police witness (*see People v. Patterson*, 93 N.Y.2d 80, 84 (1999)), who testified in detail about the videotaping and compilation process. [Lt. Cobb] explained that she viewed several hours of videotape and created a 30-minute disc that included all the footage that was relevant to the case, that is, all views of any persons involved in this case entering and leaving the building. There is no basis for disturbing the court's credibility determinations, and no reason to believe that the compilation was incomplete or otherwise unsatisfactory.

*Cabrera*, 137 A.D.3d at 707-08.

This Court agrees with the Appellate Division's conclusion that the trial court did not abuse its discretion in admitting the surveillance video into evidence. Lt. Cobb testified

extensively about the operating procedures and technical capacities of VIPER 12's surveillance operations, including her role in supervising the unit and in creating the discs that were admitted into evidence. As the "operator" or "maintainer" of the surveillance equipment, Lt. Cobb's testimony was sufficient to authenticate the evidence under New York law. *Patterson*, 93 N.Y.2d at 84; *see also Newman v. Lempke*, No. 13-cv-531 (RJA) (MJR), 2016 WL 5478512, at *9 (W.D.N.Y. Aug. 9, 2016) (holding that the admission of video evidence was not improper under New York law and recommending denial of habeas claim for that reason), *adopted by*, 2016 WL 5468062 (W.D.N.Y. Sept. 29, 2016); *Josey v. Rock*, No. 11-cv-3502 (JFB), 2012 WL 1569615, at *13-14 (E.D.N.Y. May 3, 2012) (testimony from the operator of surveillance equipment was sufficient to lay a foundation for the admission of a video into evidence).

Petitioner's claim further fails because, even if the trial court's evidentiary rulings were erroneous, he cannot demonstrate that the admission of the surveillance videos deprived him of his due process right to a "fundamentally fair trial." *Freeman v. Kadien*, 684 F.3d 30, 35 (2d Cir. 2012). Where the purportedly prejudicial evidence is "probative of [an] essential element in the case, its admission does not violate the defendant's right to due process." *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (internal quotations and citation omitted), *abrogated on other grounds by, Perry v. New Hampshire*, 565 U.S. 228 (2012). The video evidence at issue in this case—which depicted, *inter alia*, Petitioner leaving the apartment building carrying the victims' belongings—was highly probative of the elements of second-degree burglary under New York law. *See* N.Y. PENAL L. § 140.25.

Even if the evidence were only of tangential relevance, however, demonstrating that the erroneous admission of evidence amounts to a denial of due process requires that the

evidence, viewed objectively in light of the entire record, must have been "'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'" *Dunnigan*, 137 F.3d at 125 (quotations omitted); *see also Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985) (holding that erroneously introduced evidence must be "crucial, critical, highly significant") (quotations and citation omitted). Here, the testimony of Ms. Sanchez and Ms. Ballista, taken alone, provided a sufficient basis for Petitioner's conviction. Ms. Sanchez and Ms. Ballista encountered Petitioner—an individual whom they had known for a significant period of time—with their air conditioner in the hallway outside of their apartment unit, apparently trying to cart it away. They also observed Petitioner's demeanor following the incident, noting that he was "shaking a lot," seemed "nervous," and avoided eye-contact with them. (Doc. No. 20-3 p. 102.) In light of the record, there is no basis to conclude that the admission of the evidence, even if it were erroneous, deprived Petitioner of a fair trial. *See Josey*, 2012 WL 1569615, at *13 (rejecting a claim for habeas relief premised upon the allegedly erroneous admission of video evidence).

Petitioner cites to two reasons why, according to him, the admission of the surveillance video evidence was fundamentally unfair. First, Petitioner argues that the evidence was misleading and unreliable because it only depicted segments of the original surveillance footage and it did not bear time stamps. This Court disagrees. While such factors may affect how much weight the evidence is afforded, they do not render the evidence inadmissible. *See United States v. Whittingham*, 346 F. App'x 683, 685 (2d Cir. 2009) (discrepancies with the time stamps in a video "may make the evidence less credible to the jury, but it does not make it inadmissible."); *see also People v. Carter*, 131 A.D.3d 717, 721-22 (3d Dep't 2015) (holding that

an edited surveillance video depicting only the relevant portions of the footage was admissible). At trial, Petitioner's counsel vigorously objected to the introduction of People's 1 and 12 at various points during the proceedings. Since Petitioner opted to proceed with a bench trial, the trial judge was aware of counsel's evidentiary objections and could consider such arguments in his assessment of the evidence presented against Petitioner. Moreover, judges are trained to assess and critique the reliability of video evidence to a greater extent than most jurors, which further mitigates against any prejudicial effect.

Second, Petitioner argues that the evidence could not be sufficiently authenticated because Lt. Cobb's testimony was not credible. Similar to Petitioner's first argument, "[t]he credibility of the authenticating witness and any motive she may have had to alter the evidence go to the weight to be accorded this evidence, rather than its admissibility." *People v. Agudelo*, 96 A.D.3d 611, 612 (1st Dep't 2012) (citation omitted). And, in the absence of clear and convincing evidence to the contrary, this Court is bound by the factual findings of the state court, which concluded that Lt. Cobb's testimony was sufficiently credible to lay the foundation for the admission of the surveillance footage. *See* 28 U.S.C. § 2254(e)(1).

In sum, this Court cannot conclude that the Appellate Division's decision regarding the admissibility of the surveillance video was "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. This Court therefore recommends dismissing Petitioner's first claim for habeas relief.

**B.  *"Weight Of The Evidence" Claim***

Petitioner's second claim is that the trial's court verdict was against the weight of the evidence. Respondent argues that this claim is unexhausted and, furthermore, is not cognizable

on habeas review because it does not present any federal claim. This Court agrees with Respondent that Petitioner's "weight of the evidence" claim is unexhausted and procedurally barred.

As stated above, a petitioner must "*fairly present* [his] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (emphasis added). A state prisoner can "fairly present," *id*., his claims in several ways, including through:

> (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Carvajal*, 633 F.3d at 104 (citing *Daye v. Att'y Gen. of New York*, 696 F.2d 186, 194 (2d Cir. 1982)). "[A] state prisoner is not required to cite 'chapter and verse of the Constitution' in order to satisfy this requirement," *id*. (citing *Daye*, 626 F.2d at 194), but "it is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court." *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

Although Petitioner invoked a full round of state appellate review by advancing his "weight of the evidence" claim before the Appellate Division and the Court of Appeals, Petitioner failed to fairly present the federal nature of this claim to either the Appellate Division or the Court of Appeals. Petitioner's submissions to the state courts did not refer to the federal Constitution, cite to federal case law or state law cases employing a federal Constitutional analysis, or otherwise recite a pattern of facts sufficient to apprise the state courts of a constitutional claim in connection with his "weight of the evidence" argument. *Daye*, 696 F.2d

at 194; *see also Carvajal*, 633 F.3d at 106-07. This Court accordingly concludes that this claim is unexhausted.

Since Petitioner failed to exhaust this claim, the Court must next determine whether Petitioner would be able to return to state court to exhaust it. This Court concludes that he could not. Petitioner has already filed one application for leave to appeal to the Court of Appeals, and New York's procedural rules preclude any further applications. *See* N.Y.C.R.R. § 500.20(a)(2). Petitioner also does not have any basis for collateral post-conviction review in the state courts with respect to this claim because it was already raised before the Appellate Division. *See, e.g.,* N.Y. C.P.L. § 440.10(2)(c) (motions to vacate the judgment cannot be premised on record-based claims that could have been raised on direct appeal); N.Y. C.P.L. § 440.20(2) (motion to set aside a criminal defendant's sentence must be denied when issue raised was previously determined on the merits on direct appeal). Thus, Petitioner's claim is procedurally defaulted. *Jackson*, 763 F.3d at 133. Petitioner presents no basis to overcome this procedural bar. He offers no "cause for the default and prejudice." *Carvajal*, 633 F.3d at 104. Nor has he shown that he is "actually innocent" of the underlying crime. *Id.* Accordingly, this Court recommends that Petitioner's "weight of the evidence" claim be dismissed.[5]

---

[5] Even if Petitioner's "weight of the evidence" claim were properly exhausted, it would nevertheless fail because such claims are not a basis for habeas relief. *See McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011) ("[t]he argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus") (citing *Estelle*, 502 U.S. at 67-68); *Garrett v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) ("[u]nlike a sufficiency of the evidence claim, which is based upon federal due process principles, a weight of the evidence claim is an error of state law, for which habeas review is not available") (internal citations omitted).

**C.** *Untimely* **Brady** *Disclosure Claim*

Petitioner next argues that the State's untimely disclosure of impeachment material regarding Lt. Cobb precluded him from using the material in planning his defense, and thus deprived him of his due process rights. In opposition, Respondent contends that the Appellate Division reasonably applied Supreme Court law in rejecting Petitioner's *Brady* claim.

Petitioner raised his *Brady* claim in his Appellate Division brief and in his letter to the Court of Appeals, referring to *Brady* by name. The Court finds that Petitioner fairly presented this claim to both the Appellate Division and the Court of Appeals, and, accordingly, it is fully exhausted.

1. *Legal Standard Governing* Brady *Claims In A Habeas Petition*

The State's duty to disclose evidence favorable to the defendant in a criminal proceeding is well-rooted and dates back at least as far as the early 20th century. *Kyles v. Whitley*, 514 U.S. 419, 432 (1995). In *Brady*, the landmark case in this line of jurisprudence, the Supreme Court held that the prosecution's failure to disclose to the defense all material, exculpatory evidence violates a criminal defendant's right to due process. 373 U.S. at 87 (holding that "suppression by the Prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the Prosecution."). Under *Brady*, the State is also required to disclose information that could be used to impeach a government witness. *See Giglio v. United States*, 405 U.S. 150, 154-55 (1972). *Brady* disclosure obligations exist "whether or not the defense requests exculpatory evidence." *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015) (citing *United States v. Bagley*, 473 U.S. 667, 681-82 (1985); *Giglio*, 405

U.S. at 154-55). However, "[i]t does not follow from the prohibition against concealing evidence favorable to the accused that the Prosecution must reveal before trial the names of all witnesses who will testify unfavorably. There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).

"There are three components of a . . . *Brady* violation: [i] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [ii] that evidence must have been suppressed by the State, either willfully or inadvertently; and [iii] prejudice must have ensued." *Lewis*, 790 F.3d at 123 (internal quotations and citations omitted). To establish prejudice, a petitioner generally "must show that the [withheld] evidence was material." *Id*. at 124. As the Supreme Court has explained:

> a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal . . . . [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434 (internal citations omitted).

The question of when the State must comply with its disclosure obligations is intertwined with two elements of a *Brady* violation: whether there was prejudice and whether there has been a "suppression" of evidence. *See United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001); *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001). As the Second Circuit has noted, "[i]t is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require, except in terms of the sufficiency, under the circumstances, of the defense's

opportunity to use the evidence when disclosure is made." *Leka*, 257 F.3d at 100 (citations omitted). "Thus disclosure prior to trial is not mandated." *Id.; see also United States v. Espinal,* 96 F. Supp. 3d 53, 66 (S.D.N.Y. 2015) ("A defendant has no constitutional right to receive *Brady* material prior to trial.") (citation omitted). Rather, it is a "longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Coppa*, 267 F.3d at 144.

      2.  *Application Of* Brady *To Petitioner's Habeas Claim*

Under this standard, this Court finds that the Appellate Division did not ignore or unreasonably apply clearly established federal law in finding that Petitioner was not prejudiced by the State's belated disclosure of impeachment material regarding Lt. Cobb. Although the Appellate Division did not specifically cite to *Brady* in its analysis, its opinion clearly stated that it was rejecting Petitioner's *Brady* claim due to lack of prejudice, which is an element of a *Brady* violation. *Cabrera*, 137 A.D.3d at 708; *see also Hawthorne v. Schneiderman*, 695 F.3d 192, 196 (2d Cir. 2012) (where a state appellate court decides an issue of federal law in a summary fashion, federal courts exercise AEDPA deference by asking first, "what arguments or theories . . . could have supported the decision of the state court, and second, whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.") (internal quotations and citation omitted).

As set forth above, a criminal defendant will not be prejudiced by the belated disclosure of impeachment materials so long as he "possess[ed] *Brady* evidence in time for its effective use" at trial. *Coppa*, 267 F.3d at 144. Here, the Appellate Division held that this requirement

was satisfied and that Petitioner had sufficient time to use the impeachment evidence in cross-examining Lt. Cobb. *Cabrera*, 137 A.D.3d at 708. This Court agrees with the conclusion of the Appellate Division. The State explained it had not originally intended to call Lt. Cobb as a witness because it thought it could lay a sufficient foundation for introduction of the surveillance video without her. At trial, as soon as it became apparent to the State that the maker of the video would have to be called and it learned the identity of that person, it disclosed the impeachment materials. Petitioner's trial counsel was able to use the disclosures to try to challenge Lt. Cobb's credibility, including by questioning Lt. Cobb about the removal of her shield, being placed on modified assignment, and being under indictment in an unrelated case.

Moreover, as the Appellate Division observed, "[t]he [trial] court provided a suitable remedy [to any potential prejudice] when it offered defendant an adjournment to prepare for cross-examination, a remedy that could have readily been implemented in a nonjury trial, but that offer was declined."[6] *Id.* Under such circumstances, the considerations of due process and fundamental fairness that underlie *Brady* are not called into question. *See California v. Trombetta*, 467 U.S. 479, 485 (1984); *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990); *Espinal*, 96 F. Supp. 3d at 69 (although the government unreasonably delayed in handing over material evidence, defendant was not prejudiced because he was offered and accepted numerous adjournments of the trial); *Acosta v. Miller*, No. 04-cv-7963 (GEL), 2005 WL 3358673,

---

[6] For the same reasons, Petitioner also has failed to establish that the Appellate Division's finding of no prejudice was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Under this second prong of Section 2254(d), the state court's factual findings are presumed to be correct, unless the petitioner is able to rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997). Petitioner has not met this exacting standard.

at *1 (S.D.N.Y. Nov. 30, 2005) (although habeas petitioner did not receive *Brady* material until mid-trial, petitioner was not prejudiced because he received material soon enough to be "able to exploit whatever exculpatory value the material had"); *Gonzalez v. Bradt*, No. 6:13-cv-6574 (MAT), 2014 WL 1355448, at *9 (W.D.N.Y. Apr. 7, 2014) (holding that habeas petitioner could not establish that he was prejudiced by delayed *Brady* disclosures where defense counsel declined the court's offer of time to investigate the newly disclosed information).

Petitioner argues that earlier disclosures about Lt. Cobb could have affected his trial strategy, including his decision to waive a jury trial. He contends that "[d]efense counsel might have reasonably concluded that the impeachment evidence would have been more effective in front of a jury rather than a judge." (Doc. No. 15 p. 27.) Due process is not implicated, however, "unless there is a reasonable probability that earlier disclosure of the evidence would have produced a different result at trial." *Coppa*, 267 F.3d at 144 (citations omitted). Petitioner presents no factual basis to suggest that he would have in fact proceeded with a jury trial if the impeachment evidence was disclosed earlier; he simply states that counsel may have thought that a jury would be more receptive to this particular evidence. However, even if Petitioner could establish that he would have opted for trial by jury, there is no reason to believe that a jury trial would have resulted in a different outcome given the State's evidence against Petitioner. The evidence presented to a jury, including the surveillance footage of Petitioner entering the apartment building empty-handed and leaving with the victims' personal belongings in his hand, as well as the testimony of Ms. Sanchez and Ms. Ballista regarding their encounter with Petitioner on the day of the incident, would have been as convincing to a jury as to a judge.

Under AEDPA's standard of review, this Court cannot find that the Appellate Division's determinations are objectively unreasonable or contrary to federal law. Accordingly, this Court recommends dismissing Petitioner's third ground for habeas relief.

**D.** *Ineffective Assistance Of Counsel*

Finally, Petitioner argues that his trial counsel's performance before and during trial was so deficient that he was deprived of his Sixth Amendment right to assistance of counsel. Specifically, Petitioner contends that his trial counsel erred by: (1) failing to investigate whether he was suffering from any mental illnesses that could have been the basis for an insanity defense; (2) failing to inform him that a conviction for second-degree burglary would subject him to deportation; and (3) failing to ask for a JRAD.

Respondent argues in its opposition that this claim is unexhausted, and asks the Court to dismiss it as "plainly meritless" under 28 U.S.C. § 2254(b)(2) and *Rhines v. Weber*, 544 U.S. 269 (2005). Respondent argues that Petitioner's trial counsel represented him vigorously, and that "[t]he fact of [P]etitioner's conviction was not a reflection of [defense counsel's] efforts . . . ." (Doc. No. 22 p. 32.)

1. *Exhaustion*

Petitioner's ineffective assistance of counsel claim, asserted for the first time on habeas review, is plainly unexhausted. Petitioner did not raise this argument before the Appellate Division or the Court of Appeals. As a result, Petitioner failed to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845.

Unlike his first two claims for habeas relief, however, Petitioner may return to state court and exhaust his ineffective assistance of counsel claims by filing a motion to vacate the judgement under New York Criminal Procedure Law Section 440.10. Under Section 440.10, a state prisoner may raise arguments that may not be raised on direct appeal and may be based upon facts and claims outside the record. N.Y. C.P.L. § 440.10(1)(f). Thus, Petitioner's ineffective assistance of counsel claims are not procedurally barred because he could return to state court to seek collateral review of these new claims.

Nevertheless, under the AEDPA, a federal habeas court may deny a claim on the merits "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). For the reasons that follow, this Court finds that Petitioner's ineffective assistance of counsel claims are clearly meritless and should be dismissed.

2. *Legal Standard Governing Ineffective Assistance Of Counsel Claims In A Habeas Petition*

The Sixth Amendment of the U.S. Constitution provides that a criminal defendant "shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Habeas petitions asserting claims for ineffective assistance of counsel are analyzed under the "clearly established" federal law standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See also Chaidez v. United States*, 133 S.Ct. 1103, 1107-08 (2013) (noting that *Strickland* "provides sufficient guidance for resolving virtually all claims of ineffective assistance, even though their particular circumstances will differ") (internal quotations and citation omitted). Under *Strickland*, a petitioner claiming ineffective assistance of counsel in violation of the Sixth Amendment must establish both elements of a two-pronged test: (1) that his counsel's representation "fell below an objective standard of reasonableness," and (2) "that there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 688, 692-94.[7]

Under the first prong of the *Strickland* test, counsel is considered ineffective when his or her efforts fall "below an objective standard of reasonableness." *Williams*, 529 U.S. at 390-91 (quoting *Strickland*, 466 U.S. at 688). Petitioner bears the burden of demonstrating that counsel's errors were "so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment." *Harrington*, 562 U.S. at 104 (citation omitted). This standard is intentionally high because ineffective assistance claims "are quite often the law's equivalent of 'buyer's remorse' or 'Monday morning quarterbacking' ... [and d]ecisions by criminal defense counsel are often choices among bad alternatives . . . ." *Mui v. United States*, 614 F.3d 50, 57 (2d Cir. 2010). Because ineffective assistance of counsel claims "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, . . . the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington*, 562 U.S. at 105 (citing *Strickland*, 466 U.S. at 689-90). In applying *Strickland*, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotations and citation omitted).

---

[7] The Court in *Strickland* explained that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. The Court further acknowledged that "[t]here are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id.* at 689.

A petitioner can demonstrate prejudice by proving that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Williams*, 529 U.S. at 391 (internal quotations omitted). Thus, in determining whether a defendant or habeas petitioner has suffered prejudice as a result of his counsel's allegedly unreasonable acts or omissions, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently . . . . Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Harrington*, 562 U.S. at 111 (citations omitted). In other words, the "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695; s*ee also United States v. Thornhill*, 34 F. Supp. 3d 334, 360 (S.D.N.Y. 2014) (it is not enough to show that counsel's act or omission had some effect on the outcome of the case, "as virtually every act or omission of counsel would meet that test . . . ") (quoting *Strickland*, 466 U.S. at 693).

"Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland*, 466 U.S. at 700. Thus, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

3. *Application Of* Strickland *To Petitioner's Ineffective Assistance Of Counsel Argument Regarding Counsel's Failure To Pursue An Insanity Defense*

Petitioner first argues that his trial counsel was ineffective for failing to investigate or pursue an insanity defense. In New York, it is an affirmative defense to the prosecution of a crime that at the time the defendant engaged in the proscribed conduct, he lacked substantial capacity to know or appreciate the nature of his conduct, or that his conduct was wrong, because of a mental disease or defect. N.Y. PENAL L. § 40.15. To prevail on an insanity defense, a defendant bears the burden of demonstrating his insanity by a preponderance of the evidence. *See People v. Kohl*, 72 N.Y.2d 191, 195 (1988).

Addressing the first prong of the *Strickland* test, the Supreme Court has stated that it "has never required defense counsel to pursue every . . . defense, regardless of its merit, viability, or realistic chance for success." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). While criminal defense counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *Strickland*, 466 U.S. at 691, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, . . . and even strategic choices made after less than complete investigation do not amount to ineffective assistance—so long as the known facts made it reasonable to believe that further investigation was unnecessary." *Rosario*, 601 F.3d at 129-30 (citations omitted).

In this case, Petitioner has not pointed to anything in the record to suggest that counsel erred in failing to investigate whether he had an insanity affirmative defense. Nor has he

alleged any new facts to support his conclusory assertion that trial counsel should have

considered or pursued such a defense. Indeed, nothing in the record even suggests that

Petitioner suffered from a mental disease or defect, much less one that was significant enough

to predicate a potentially viable insanity defense. The law is clear that trial counsel in a criminal

case is not required to pursue an affirmative defense that does not appear to have any factual

support, or that trial counsel should subject her client to rigorous psychiatric testing when there

is no reason to believe that her client was suffering from mental illness. As a result, there is no

basis for this Court to conclude that it was unreasonable for counsel to have failed to

investigate or raise this potential affirmative defense.

As to the second prong of the *Strickland* test, Petitioner also cannot demonstrate that

he suffered prejudice because of counsel's decision not to pursue an insanity defense. In order

to show prejudice, Petitioner must establish that there was a reasonable probability that he

could have prevailed upon this defense had he pursued it. *Knowles*, 556 U.S. at 127-28.

Petitioner has failed to make this showing here because there is no reason to believe that he

would have succeeded on any potentially insanity defense.

4.  *Application Of* Strickland *To Petitioner's Ineffective Assistance Of Counsel Arguments Regarding His Waiver Of A Jury Trial*

Petitioner next contends that his trial counsel was ineffective for failing to inform him

that he would be subject to deportation if found guilty of burglary. Petitioner suggests that if

his trial counsel had properly advised him of the immigration consequences of a conviction, he

may not have waived his right to a jury trial.

Respondent contends that Petitioner did not suffer prejudice from trial counsel's alleged

failure to advise of the immigration repercussions of a possible conviction because Petitioner

was already subject to deportation on account of his prior conviction for the attempted possession of cocaine. This position misstates the applicable standard. The question this Court must answer is not, as Respondent asserts, whether Petitioner would have been subject to deportation irrespective of whether trial counsel informed Petitioner of the immigration risks he faced, but rather whether "but for counsel's unprofessional errors, the result of the [trial court] proceeding would have been different." *Strickland*, 466 U.S. at 694. Put differently, the relevant inquiry is whether there is a reasonable probability that, if Petitioner had known about the immigration consequences of a conviction, he would have (1) decided not to waive his right to a jury trial and (2) been found not guilty by a jury.

Addressing this question, the Court finds that Petitioner cannot establish prejudice from counsel's alleged error. First, Petitioner does not assert that he would have opted to proceed with a jury trial if his counsel had advised him that he would be subject to deportation as a result of any conviction. If Petitioner would have waived his right to a jury trial even absent the alleged error, then the results of the bench trial would have been exactly the same. *See id.* Nor is there any reason to suppose that the outcome of the trial would have been different if Petitioner had proceeded with a jury trial for the reasons set forth above in Section C. Thus, even absent trial counsel's alleged errors, the Court finds that there is no reasonable basis to conclude that the proceedings would have resulted in a different outcome. *Id.*

5. *Application Of* Strickland *To Petitioner's Ineffective Assistance Of Counsel Arguments Regarding Counsel's Failure To Ask For A JRAD*

Finally, this Court rejects Petitioner's argument that counsel was ineffective for failing to ask the trial court for a recommendation against deportation. As the Supreme Court has stated, "the JRAD procedure is no longer part of our law." *Padilla v. Kentucky*, 559 U.S. 356, 363 (2010)

(explaining that Congress eliminated the JRAD provision of the immigration law in 1990 and also eliminated the Attorney General's authority to grant discretionary relief from deportation). If a noncitizen is convicted of a removable offense, removal is practically inevitable but for the exercise of what little equitable discretion the Attorney General retains to cancel removal for noncitizens convicted of particular classes of offenses. *Id*. at 363-64. Therefore, there is no basis to conclude that Petitioner's trial counsel acted unreasonably in failing to request a JRAD when such relief was plainly unavailable.

## CONCLUSION

For the foregoing reasons, this Court concludes, and respectfully recommends, that the Petition be dismissed in its entirety.

Date:   October 13, 2017
          New York, New York

*Katharine H Parker*
_____
KATHARINE H. PARKER
United States Magistrate Judge

## NOTICE

**Petitioner shall have seventeen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure (*i.e.,* until October 30, 2017). *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). Respondent shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure (*i.e.,* until October 24, 2017).**

**If Petitioner files written objections to this Report and Recommendation, Respondent may respond to Petitioner's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Alternatively, if Respondent files written objections, Petitioner may respond to such objections within seventeen days after being served with a copy. Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a), (d). Such objections shall be filed with the Clerk of the**

Court, with courtesy copies delivered to the chambers of the Honorable Katherine Polk Failla at the United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Failla. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).